1769

TIMBERLAKE PLANTATION COMPANY, Respondent v. COUNTY OF LEXINGTON, South Carolina, Columbia Cable T.V. Company, Inc., and Star Cable Associates, Defendants, Of Whom Columbia Cable T.V. Company, Inc., is Appellant, And Star Cable Associates, is Respondent. Appeal of COLUMBIA CABLE T.V. COMPANY, INC.

(415 S.E. (2d) 824)

Court of Appeals

*D. Reese Williams, III*, and *Frank R. Ellerbe, III*, of *Robinson, McFadden & Moore*, Columbia, *for appellant.*

*Michael McKeithen, pro se.*

*Nina Nelson Smith, Nelson, Mullins, Riley & Scarborough*, Columbia, and *Leonard J. Marsico*, of *Buchanan Ingersoll Professional Ass'n*, of Pittsburgh, Pa., *for respondent Star Cable Associates.*

Heard Jan. 14, 1992.

Decided Feb. 24, 1992.

*Per Curiam:*

Plaintiff-Respondent, Timberlake Plantation Company (Timberlake) a residential subdivision developer brought this action against Lexington County, South Carolina, Defendant-Appellant, Columbia Cable T.V. Company, Inc. (CCTV) a provider of cable T.V. services, and against Defendant-Respondent, Star Cable Associates (Star) also a provider of cable T.V. services, asking the court by way of a declaratory judgment to determine the rights of these two providers of T.V. services within its development. Lexington County takes a neutral position and is not concerned with the result of this litigation. CCTV and Star have interposed counterclaims and/or cross actions not momentarily of concern in this appeal.

The circuit court judge enjoined CCTV from operating within the development and approved Star as the provider of services. CCTV appeals. We reverse.

## ISSUES

The issues as taken from the brief of CCTV are as follows:

Does the Federal Cable Communications Policy Act authorize Columbia Cable T.V. Company, Inc. to use public rights-of-way and utility easements within Timberlake Plantation to lay its cable in order to offer service to homeowners in the development?

Does the South Carolina Cable Television Act authorize Columbia Cable T.V. Company to lay its cable along public roads in Timberlake Plantation?

We think, however, the real and more important issue involved in this case is as follows:

May a residential real estate developer, such as Timberlake, grant to one provider of T.V. cable services the exclusive right to operate within its properties under the facts hereinafter set forth and by so doing deprive the owners of the homes the benefit of T.V. cable services competition under the state and federal statutes?

## FACTS

Timberlake is composed of 125 residential lots, 123 of which

have been sold. Sixty homes have been built already. Relevant stipulation of facts before the trial judge were as follows:

> . . . Defendants Star Cable Associates (Star Cable) and Columbia Cable T.V. Company, Inc. (CCTV) possesses non-exclusive franchises to provide cable television service in Lexington County.
>
> On May 4, 1987, Timberlake and defendant Star Cable entered an [exclusive] agreement whereby Timberlake and Star Cable agreed that Star Cable would provide cable television service in the residential community being developed by Timberlake. . . .
>
> On or about October 9, 1987, Timberlake filed with the Lexington County Register of Mesne Conveyances a document entitled "Third Amendment to Declaration of Covenants, Conditions, Restrictions and Easements for Timberlake plantation.' Section 5.05 of this Declaration provided in part:

> > Section 5.05 *Utility Easements.* There is hereby created a general easement upon, across, over, in and under the Property for ingress and egress and for installation, replacement, repair and maintenance of all utilities, including but not limited to water, sewer, gas, telephone, electricity, cable television and master communication system. By virtue of this easement it shall be expressly permissible and proper for the companies providing electricity, telephone, cable television and other communication services to install and maintain necessary equipment on the property and to affix and maintain electricity, communications, cable television and telephone wires, conducts, and circuits under the property. No water, sewer, gas, telephone, electricity, cable television or communications lines, systems or facilities may be installed or relocated on the surface of the Property unless approved by Declarant prior to termination of the Class B members, or after such termination, by the Architectural Review Board. Such utilities temporarily may be installed above ground during construction, if approved by Declarant or the Architectural Review Board as stated above. Should any utility

company furnishing a service covered by this general easement request a specific easement by separate recordable document, either Declarant or the Association shall have, and are hereby given, the right and authority to grant such easement upon, across, over or under any part or all of the Property without conflicting with the terms of this Declaration. This general easement shall in no way affect, avoid, extinguish or modify any other recorded easement on the Property.

On May 21, 1987 and May 22, 1987, Timberlake granted utility easements to Mid-Carolina Electric Cooperative. Such easements are located along Amick's Ferry Road.

On August 31, 1987, Timberlake granted easements to South Carolina Electric and Gas Company, Inc. The Easements granted run throughout Timberlake Plantation.

At the present time South Carolina Electric and Gas and Southern Bell Telephone Company have buried lines, cables and facilities in utility easements throughout Timberlake plantation and are providing electricity and telephone service to customers in Timberlake Plantation.

On or about August 2, 1988, Lexington County accepted for county maintenance certain roads dedicated by Timberlake by filing a final plat in the office of the Lexington County Register of Mesne Conveyances at Plat Book 226, page 79. This plat did not dedicate all roads located within Timberlake Plantation; certain roads designated 'Privately Maintained Road' were not dedicated for public maintenance. The certification by which Timberlake dedicated roads within Timberlake Plantation reads as follows:

I hereby certify that I am a Vice President of Timberlake Plantation Company, the owner of the property shown and described hereon as Timberlake Plantation/Club Points, Subdivision, Phase I, and that Timberlake Plantation Company adopts this plan of subdivision with its free consent, establishes easements and rights-of-way as noted, and dedicates all roads and associated storm drainage for public maintenance. I also certify that all current State and County taxes or other assessments relative to this property have been paid. Furthermore, Timberlake Plantation Company, as owner of the property

shown and described hereon, reserves unto itself certain rights as to any encroachment into the established easements and rights-of-way above. Any such encroachment of easements and rights-of-way will require prior written recorded approval of Timberlake Plantation Company or its assignee, Timberlake Plantation Property Owners' Association, Inc.

On or about November 15, 1988, CCTV obtained encroachment permits from Lexington County which related to CCTV's plans to lay cable in Timberlake Plantation. The full effect of these permits is a matter of dispute.

Star Cable has also been issued encroachment permits to lay cable and install facilities within Timberlake Plantation.

At the present time the roads within Timberlake Plantation which were dedicated for county maintenance are open to the public.

Whether or not CCTV needs Timberlake's consent before it may construct a cable television system in Timberlake Plantation is a question in issue in this case. However, it is undisputed that Timberlake has not consented to CCTV's construction of a cable television system in the Plantation.

Prior to the exclusive agreement between Timberlake and Star, Timberlake had unsuccessfully attempted to negotiate a contract with CCTV. Soon after the Star-Timberlake contract, CCTV contacted Timberlake in an effort to negotiate for the right to provide services but Timberlake refused because of its prior commitment to Star.

Notwithstanding such refusal CCTV prepared to lay cables, and placed its advertisements on the doors of the many residents. Timberlake had the sheriff stop it. Thereafter, Timberlake commenced this action to have the rights of the parties settled.

## LAW

The rights of the parties are controlled by state and federal statutory law and any contract entered into contrary to these statutes is void. The Federal Communications Policy Act is found in 47 U.S.C.A. § 521 *et seq.* One purpose of the act is set forth in § 521 as follows:

The purposes of this subchapter are to . . . promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

Section 541 reads as follows in part:

(1) A franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction.

(2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been *dedicated for compatible uses*, except that in using such easements the cable operator shall ensure—. . . . [Emphasis added.]

Section 58-12-40 of the South Carolina Code of 1976 Annotated reads:

Any easement or right-of-way obtained after June 29, 1976, by the State or any political subdivision thereof for the purpose of constructing a highway or public road and any easement of right-of-way obtained by any telephone or electric power company from the owner of any land who had previously granted an easement to this State or any political subdivision thereof for the purpose of constructing a highway or public road upon such land to which the easement or right-of-way relates shall clearly set forth the possibility that the easement or right-of-way may be used in the future by cable television companies for the purposes provided in this chapter.

The trial judge held § 58-12-40 inapplicable. Therein we think he erred. However, we reverse under the federal statute which appears to be more comprehensive.

## DISCUSSION

By granting an exclusive contract to Star, Timberlake would effectively create a monopoly depriving all residents of the subdivision of the benefits competition provides. Such is inconsistent with the letter and the spirit of both the state and federal acts.

It is obvious that both statutes were enacted, not for the benefit of cable operators or for the benefit of real estate de-

velopers, but for the purposes of assuring homeowners the benefit of competition. Timberlake dedicated its streets for maintenance only and granted electricity and telephone easements. The claim of CCTV to use the easements is compatible with such uses. Counsel for Star argues that the limited easement makes the statute inapplicable. We disagree.

We find no South Carolina case interpreting either the federal act or the state act. There is, however, respectable authority for the view we take.

In *Centel v. Admiral's Cove Assoc., Ltd.*, 835 F. (2d) 1359 (11th Cir. 1988), the United States Court of Appeals outlined the legislative history of the Cable Act and concluded that " . . . one of the principal purposes behind the Cable Act was to encourage the growth of cable industries." It quoted the history of the enactment as follows:

> By establishing a national framework and Federal standards for cable franchising, the Cable Act provides the cable industry with the stability and certainty that are essential to its growth and development. In adopting this legislation, the Committee has endeavored to create an environment in which cable will flourish, providing all Americans with access to a technology that will become an increasingly important part of our national communications network.

The court went on to hold that the statute created a cause of action in favor of cablevision companies which were denied rights envisioned by the statute.

By way of additional sustaining grounds, counsel for Star submits that CCTV waived its rights and should be estopped from claiming the benefit of the statutes because it was given an opportunity to contract with Timberlake early in the game and refused. That fact is irrelevant. Such could in no event prejudice the rights of homeowners to have the benefit of competitive cable television. We find no merit in this contention.

In brief counsel for Star argues that permitting CCTV to use the easements violates the constitutional takings clause. That issue was not before the court below and is not proper for consideration here. *See Centel v. White*, 902 F. (2d) 905 (11th Cir. 1990).

The authority of a subdivider to dedicate easements for maintenance only is of questionable purity, but that issue too is not before the court.

Counterclaims and/or cross actions are still pending before the court. These may be dealt with on remand.

For reasons indicated hereinabove, the order of the trial judge is reversed.

Reversed and remanded.